IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Carlos Ortiz,                              §
                                           §
    Defendant Below,                       §
    Petitioner,                            §
                                           §          08 - 4 8 7
v.                                         §     No.
                                           §
Perry Phelps,                              §
    Plaintiff Below,                       §
    Respondent                             §

MEMORANDUM OF LAW IN SUPPORT OF
PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY



FILED

AUG – 5 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

# TABLE OF CONTENTS

TABLE OF CITATIONS AND AUTHORITIES

SUMMARY OF ARGUMENT

ARGUMENT:

      I.     Whether Trial Court erred by admitting evidence of Ortiz' children's out of court statements; and inadmissible interpretive narratives, thus violating Ortiz' Constitutional right of Due Process.

      II.    Whether the State withheld exculpatory evidence

      III.   Whether Ortiz was denied his right of assistance of counsel as afforded by the 6th Amendment of the U.S. Constitution due to his counsel's failure to investigate the totality of his case.

CONCLUSION

## TABLE OF CITATIONS

Hassan-El v.State, 911 A.2d 385

Crawford v. Washington, 124 S.Ct. 1354

Lee v. U.S., 106 S.Ct. 2056.

Bruton v. U.S., 88 S.Ct. 1620

Smith v. State, 669 A.2d 1

Hamden v. Rumsfeld, 126 S.Ct. 2749.

Key v. State, 337 A.2d 18

Barnes v. State, 858 A.2d 942.

U.S. v. Hendricks, 395 F.3d 173

Brady v. Maryland, 83 S.Ct. 1194

Danforth v. Minnesota, 128 S.Ct. 1029

Pointer v. Texas, 85 S.Ct 1065

Morgan v. State, 922 A.2d 395

Ortiz v. State, 831 A.2d 308

## TABLE OF AUTHORITIES

Superior Court Criminal Rule 61

Delaware Rules of Professional Conduct, Rule 1.3 Diligence

Delaware Rules of Professional Conduct, Rule 1.4 Communication

11 Del. Code 3507

6th Amendment of the U.S. Constitution

14th Amendment of the U.S. Constitution

28 U.S.C.A. 2254

Del. Constitution, Article 1 § 7

# SUMMARY OF ARGUMENT

1. Whether Trial Court erred by admitting evidence of Ortiz' children's out of court statements; and inadmissible interpretive narratives, thus violating Ortiz' Constitutional right of Due Process.

2. Whether the State withheld exculpatory evidence.

3. Whether Ortiz was denied his right of assistance of counsel as afforded by the 6th Amendment of the U.S. Constitution due to his counsel's failure to investigate the totality of his case.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Carlos Ortiz,                          §
                                       §
        Defendant Below,               §
        Petitioner,                    §
                                       §
v.                                     §        No.
                                       §
Perry Phelps,                          §
        Plaintiff Below,               §
        Respondent                     §


## ARGUMENT ONE

Whether Trial Court erred by admitting evidence of Ortiz' children's out of court statements; and inadmissible interpretive narratives, thus violating Ortiz' Constitutional right of Due Process.


On 12-20-07, The Supreme Court of Delaware affirmed the Appellant's Motion for Post Conviction Relief. In their opinion the Delaware Supreme Court committed several Constitutional violations. Among these was their failure to apply settled laws dealing with the use of out of court statements by child witnesses and the use of inadmissible interpretive narrative on the part of the testifying detective as well.

"It is the statement of the declarant that is being admitted not the interpretative narrative of the person who heard the statement." In this matter the "interpretive narrative" given by the testifying State Trooper via taped statements "I believe he raped her." (See Appendix A: Transcripts B27).

In the case at hand Ortiz notes that *11 Delaware Code 3507* deals with this issue and the use of out of court statements as a whole. *Huggins v. State*, 337 A.2d 28 clearly states "It is the statement of the declarant that is being admitted, not the interpretative narrative of the person who heard the statement." Huggins further states that "...care should be taken to warrantee that said statute is not abused by permitting a witness, such as a police officer, to embellish the prior statement by his own interpretation." *Huggins* resulted in a Reversal and a Remand for a new trial. Furthermore, accordingly, Ortiz holds that the trial court committed reversible error when it permitted the state to introduce into evidence, the officer's interpretive narrative of the conversation and the recorded statements after defendant's wife and children after they had left the stand in the direct examination so they could not the cross examination so they could not be cross examined about their statements. There was a credible issue from the start and these statements were at issue. Without the cross examination of those statements (guaranteed by *3507*) their truthfulness is at question. This case was inundated with errors by Detective Mitchell; most of which deal with the "voluntary" nature of the Ortiz children's statements. The Supreme Court of Delaware has stated that this issue was previously adjudicated in Ortiz' direct appeal (831 A.2d 308). They went on to claim that it was not warranted in the "interest of justice."

When there is a question of truthfulness as well as a misapplication of settled statutes and case rulings then judicial fairness has in fact been violated. In this case there are many such questions such as:

1. Mitchell stated that Karla Ortiz had a "good grasp" of the English language. Why then did the judge rely on an interpreter during trial?

2. There was a question of coercion about the meaning of the Spanish word for "shotgun" (Escopeta). 3. Mrs. Ortiz had stated "rifle", however only a shotgun was Ortiz' car trunk. Appendix: B-5, 11-15.

4. Once officer said shotgun, she then said shotgun in reply. Appendix: B30, 5-6

5. Geovaney said that he was forced to say "gun" under questioning. Appendix: C47, 12-15.

6. Carlos Jr. said he it was 30-30 bullet in chamber. Appendix: C-76

7. 30-30 shell never found. Only states exhibit was 1 shotgun. Appendix: C127

8. Even the trial Court admitted that there should have been more investigation. Appendix: B8, 6-8.

9. State Trooper Sgt. Swain when asked if he took notes stated "I believe I basically just filled Detective Mitchell in and he wrote down what I was...is about to tell him."

So yes there is a question of whether justice was served. Therefore in the interest of justice it should be looked at anew.

The Courts have held that a "narrow interpretation" of the statute is required because of a defendant's constitutional right to confront and cross examine a witnesses providing testimonial evidence. See: *Key v. State*, 337 A.2d 18; *Crawford v. Washington*, 124 S.Ct. 1354 and *Hamden v. Rumsfeld*, 126 S.Ct. 2749).

In Ortiz' case there was a blatant misuse of out of court statements made by the child witnesses; specifically Ortiz' two children (who incidentally were present for live testimony). The Court ruled that these statements were made voluntarily. This however is just one of core issues here. Next and of equal importance is a question which arises from the fact that the representative from Delaware Family Services (hereafter called "DFS") when questioned about statements Ortiz' sons made to her, gave elicited

testimony regarding these statements. Previous ruling have stated that elicited testimonial statements cannot be used when the person testifies at trial. Ortiz now asks this Court to examine the ruling made in *Crawford v. Washington*, 124 S.Ct. 1354 which avers that the "statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." The agent from the State (DFS) was testifying under the same color as would any other officer of the court. "The Supreme Court has held that the confrontation clause bars the state from introducing into evidence out of court statements which are testimonial in nature unless the witness is unavailable and the defendant had a prior opportunity to cross examine the witness of whether such statement are deemed reliable." Again Ortiz' sons were available for testimony. The case at hand mirrors the Crawford case in that both cases deal with video taped testimony given to the jury during trial without prior cross examination in insure that no coercion of witness had occurred and to insure the truthfulness of the video not he witness.

As far back as 1965 The U.S. Supreme Court in Pointer v. Texas, 85 S.Ct. 1065 stated that the confrontation clause in the 6th Amendment is applicable to the states by virtue of the 14th Amendment. Delaware's Constitution Article 1, Section 7 also gives the defendant the absolute right to face his accuser in direct examination.

With this in mind it is most interesting that the State of Delaware in Morgan v. State, 922 A.2d 395 stated that it is Reversible Error when the State is permitted to introduce into evidence detectives "interpretive narrative" of her conversation with witness, as a statement by witness' out-of-court prior statement of witness who is present and subject to cross examination.

Delaware Rule 3507 says that a statement [must] be offered after declarant examination which puts a burden on the defense to recall witness/declarant making

jurors believe that the defendant is sponsoring them. Furthermore it gives it prejudice by letting a police officer offer this statement, and thus makes the burden an unfair one... *Keys v. State*, 337 A.2d 18. "The best way to properly present Section 3507 evidence is by a written statement from the declarant or a redacted recorded statement of only the declarant word." (See *Hassan-El v. State*, 911 A.2d 385). This case goes on to say that "the corollary to the probation against using section 3507 to present an "interpretive narrative" is the well established principle that a statement under 3507 must not include a police officers opinion concerning the credibility of the witness." The only evidence permitted by section *3507* is the "voluntary out of court statement of a witness who is present and subject to cross examination on their direct examination. *Barnes v. State*, 858 A.2d 942.

Ortiz now asks this Court to examine the ruling made in *Crawford v. Washington*, 124 S.Ct. 1354 which avers that the "statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." "The Supreme Court has held that the confrontation clause bars the state from introducing into evidence out of court statements which are testimonial in nature unless the witness is unavailable and the defendant had a prior opportunity to cross examine the witness of whether such statement are deemed reliable." Again, in Ortiz' criminal case the Superior Court of Delaware allowed a witness of the State the right to give an interpretive narrative on their opinion of what was stated to them.

*Crawford v. Washington* says that the confrontation clause bars admission of testimonial statements made by a witness outside of court. Also *Danforth v. Minnesota*, 128 S.Ct 1029 says that Crawford applies to all those who are in direct review of the state courts.

*U.S. v. Hendricks* 395 F.3d 173 (3rd Cir.) says that Crawford does not apply where the reliability of testimonial evidence is not an issue. In Ortiz' case kids told Mary Hill, the agent from DFS that Ortiz did not have a gun. Later the one son, Ortiz Jr., changed his story. The other son, Geovany, even went as far as to write in a letter that Ortiz did not have a gun. So then apparently reliability is in fact an issue. With this being stated the matter of *Danforth v. Minnesota* must be reviewed here. Justice Stevens said "new" constitutional rules announced by this court that place certain kinds of primary individual conduct beyond the power of the states to proscribe, as well as "water-shed" rules of criminal procedure {MUST} be applied in all future trials, all cases pending on direct review and all Federal Habeas Corpus proceedings. All other new rules of criminal procedure must be applied in future trials and in cases PENDING ON DIRECT REVIEW, but may not provide the basis for a federal collateral attack on a state conviction. Therefore it is an issue for this Court to now decide.

In light of these egregious errors the Petitioner asks this Court to Reverse and Remand this case to the lower court with instruction for a new trial.

## ARGUMENT TWO

Whether the State withheld exculpatory evidence.

The Petitioner has raised a claim that his Constitutional right of Due Process of the Law was violated by the Prosecutor, Melanie Withers who withheld crucial reports which were issued by DFS and contained findings of interviews and investigations dealing specifically with Ortiz' two sons, Carlos Jr. and Geovaney.

Ortiz Jr. as stated in this report averred to the fact that his father did not have a gun. The contents of these reports are exculpatory. Withers told the trial judge that she was unaware of such interviews or reports regarding them. Defense counsel concurred with this feeling.

The Court made an attempt to rectify the situation by stopping the trial in order for both sides to read and review this new material. This attempt at a judicial cure is not the issue. Withers had a obligation in her role of prosecutor to not only seek to convict but also to uphold justice. This is an adopted standard for prosecutors by the American Bar Association. Apparently this was not fulfilled.

DFS is an agency of the State of Delaware, not an independent venue which may or may not have felt it necessary to turn their findings over to the proper authorities. Ms. Withers was obligated to investigate the full nature of this case; not just pieces of it.

The fact that the trial judge tried to cure this error only minimalizes this type of error. It violated the accepted norm set forth in Brady v. Maryland, 373 U.S. 83. These reports should have been turned over to the defense prior (emphasis added) to the

start of this trial. The court even commented on this on the record see Appendix: B58-60. Ortiz truly feels this would have altered the way his defense was presented.

In light of these egregious errors the Petitioner asks this Court to Reverse and Remand this case to the lower court with instruction for a new trial.

## ARGUMENT THREE

Whether Ortiz was denied his right of assistance of counsel as afforded by the 6th Amendment of the U.S. Constitution due to his counsel's failure to investigate the totality of his case.

The Petitioner lastly makes a claim that he was denied effective assistance of counsel as guaranteed by the *6th Amendment* of the U.S. Constitution. This is a simple issue. Ortiz states that two investigations were done by DFS. Among these were interviews with all of Ortiz's children. They were conducted by Mary Hill of DFS. Ortiz states that had Defense Attorney Haller properly communicated with his client prior to trial then he would have been made aware of this fact. Secondly, if Haller had done thorough investigation then he would have been aware that these reports existed prior to the middle of his client's criminal trial.

The standard to overcome in an Ineffective assistance of counsel argument is the 2-pronged *Strickland analysis*, 466 U.S. 668.

(1) Representation fell below an objective standard, and;

(2) As a result of this the outcome would have been different.

Delaware's own Rules of Professional Conduct for attorneys also states that this is the obligation of an attorney to properly communicate (Rule 1.4) and investigate with diligence (Rule 1.3) the totality of the case at hand. Therefore the performance prong of *Strickland* is obvious. Haller's level of representation fell below the objective standard guaranteed by the *6th Amendment*. Therefore Ortiz claims the outcome would have indeed been

different. He feels had the matter been properly communicated and investigated then his attorney would have been better prepared to represent him; thus satisfying the prejudice prong of Strickland.

Rule 1.3: Diligence: A lawyer shall act with diligence and promptness in representing his client.

And:

*Rule 1.4*: Communication: states…" (a) A lawyer shall:

(1) Promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in *Rule 1.0* is requires by these rules;

(2) Reasonably consult with the client about the means by which the client's objectives are being accomplished;

(3) keep the client reasonably informed about the status of the case;

(4) Promptly comply with reasonable requests for information; and

(5) Consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance; and

(6) *A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."*

This rule also tracks A.B.A. *Rule 1.4* as well.

The standard to overcome in an Ineffective assistance of counsel argument is the 2-pronged *Strickland analysis,* 466 U.S. 668.


Carlos Ortiz has laid out in detail all the Constitutional wrongs in this briefing. He now asks that this most honorable court review this case de novo.

In light of these egregious errors the Petitioner asks this Court to Reverse and Remand this case to the lower court with instruction for a new trial.

MARTINEZ - Direct

1    Q    Can you refer to the last sentence of your

2    first paragraph?

3    A    Do you want me to go ahead and read it?

4    Q    Right.

5    A    She further advised that Carlos tried to

6    make her perform sexual acts on him, including oral

7    sex, and also where he ordered her to touch his

8    penis.

9    Q    And he then did what to her?

10   A    Raped her.

11   Q    Was she any more specific about that with

12   you?

13   A    No, she wasn't.

14   Q    Did she make any other statements

15   regarding the gun?

16   A    The gun was very close the entire time.  I

17   believe it was lying alongside the bed while he

18   repeatedly raped her.

19   Q    Did she indicate how she was able to get

20   away?

21   A    Yes.  The little girl apparently became

22   sick.  She ran into the bedroom and advised the two

23   of them of that.  At that point, she ran out the

```
 1              We also called and asked for the copies of
 2       the DFS worker's records, and I've been told that,
 3       "They are on their way."  So I'm hoping I'll get
 4       them today.  So there is Brady material out there
 5       that I didn't know about until today.  We have made
 6       it available or have attempted to make that
 7       available to Mr. Haller.
 8              THE COURT:  And the Brady material is the
 9       material in the DFS records?
10              MRS. WITHERS:  Because the children, or at
11       least the two boys, initially told the DFS worker
12       there was no gun, that there was just an argument.
13       She interviewed them twice apparently.  She
14       interviewed them before Detective Mitchell even
15       interviewed them, and they said there was no gun.
16       They talked to Detective Mitchell and said there
17       was a gun.
18              The DFS worker contacts Detective Mitchell
19       and he says to her why are you saying nothing
20       happened.  She said, the kids told me there was no
21       gun.  She tells him she needs to talk to the kids
22       again.  She goes back to the school, and at that
23       point they go ahead and tell her what they tell me
```

B-30

MARTINEZ - Cross

1    rifle.

2        Q    And you just indicated with your hand that

3    this would be a what, barrel like an inch and a

4    half?

5        A    When I said shotgun, she was able to say,

6    yes, shotgun.  So she was familiar with that term.

7        Q    And she said it was a shotgun and not a

8    small rifle?

9        A    Small rifle, no.  Shotgun.

10        Q    And you all questioned her about it being

11    a shotgun?

12        A    Correct.  Like I said, I wanted to make

13    sure I understood what she was trying to tell me.

14        Q    And she said she was beaten in the face

15    and abdomen?

16        A    Yes.

17        Q    And did she describe how she was beaten?

18    In other words, with this gun or what?

19        A    Basically with hands.  She was kicked, I

20    believe, too.

21        Q    Did you see any injuries to her face or

22    abdomen?

23        A    I saw some minor bruising, some redness.

 1      A    Yeah.

 2      Q    And the gun was about that long (indicating)?

 3      A    Yeah.

 4      Q    Two feet, two and a half feet long?

 5      A    Yeah.

 6           MRS. WITHERS:  May I approach?

 7           (Whereupon, counsel approached the bench

 8      and the following proceedings were had:)

 9           MRS. WITHERS:  3507 again, Your Honor.

10           MR. HALLER:  I will just question now.

11           THE COURT:  You will cross now?

12           MR. HALLER:  I think there is a question

13      about the coercion with the officer.  He said he was

14      coerced.  I think the State has to be able to show

15      there wasn't coercion.  It is not like with the truth.

16           THE COURT:  I think he was simply asked to

17      come into the room and be interviewed.

18           MRS. WITHERS:  He said he felt okay about

19      going in there.  When you ask, "Did you speak freely

20      and voluntarily?," they don't even know what that

21      means.  I think he explained the officer asked him in

22      and he felt okay.  He just didn't like having to tell

23      on his dad.

C.Ortiz, Jr. - Direct                C-76

1    A    Two or three weeks.

2    Q    Could it have been just a few days?

3    A    Probably.  I can't remember.

4    Q    So when you all woke up, your dad was in the

5    bedroom?

6    A    Yeah.

7    Q    And your mom was crying?

8    A    Yeah.

9    Q    Do you know what time of night it was when he

10   came in?

11   A    12:00 through 1:00.

12   Q    Sometime around midnight?

13   A    Yeah.

14   Q    And did he have anything with him?

15   A    Yes.  A gun.

16   Q    What kind of a gun?

17   A    It was a 30-30 automatic.

18   Q    Automatic?  What kind of gun?

19   A    A 30-30.

20   Q    Is that --

21   A    It is like a rifle.

22   Q    What did it look like?

23   A    Well, it was big.

1    a little bit --

2            MR. HALLER:  The letter is unsigned.

3    We've had the letter for quite a while, but it was

4    unsigned.  It wasn't until I, you know, heard the

5    child say that the letter was actually written.

6    I'm sure in my mind that's where it came from.  So

7    anyway, we have a lot of things that would have led

8    to more investigation.  There are other statements

9    that we have that might flow out of the Social

10   Service business, namely, statements of the

11   children to Roberto, who was the defendant's

12   brother.  And then there may be statements to a

13   girl named Lisa and another woman named Pam.

14           THE COURT:  Who are those people?

15           MR. HALLER:  They are friends of the

16   defendant.

17           THE COURT:  The DFS worker was talking to

18   them?

19           MR. HALLER:  No, not the DFS worker.  One

20   or two of the children looks like may have been

21   talking to them.  It's consistent with what the DFS

22   worker was initially told.

23           MRS. WITHERS:  Lisa and Pam, I think, are

KATHY S. PURNELL
OFFICIAL COURT REPORTER

1    covered with dust.  So it kind of led me to believe

2    that it was recently placed there.

3        Q    So you thought at that point you had the

4    right gun?

5        A    That's correct.

6        Q    When you showed the gun to Marisol Ortiz, she

7    told you what?

8        A    As soon as I walked in the room, she was

9    like, "That is not it."

10       Q    I said, "Are you sure?"  She said, "Yeah."

11   That's when she provided me further information, a

12   30-30, definitely a rifle; not a shotgun.

13       Q    Did you try to talk to Carlos, Jr., or

14   Geovany in specifics to describe that gun for you?

15       A    Yes, ma'am, I did.  They provided a similar

16   description.  Carlos actually said it was a thirty-

17   thirty and he was aware it was a 30-30 because his

18   father had three weapons.  One was a .22, which was

19   turned in pursuant to a protection order from Family

20   Court; the 30-30; and the one I recovered.

21       Q    When did Carlos give you that information?

22       A    The beginning part of April.

23       Q    So not back when you were originally

1    would not relay those things to you or your

2    investigator.

3              MRS. WITHERS:  Well, they are under

4    subpoena.  They both are under subpoena.  Roberto,

5    the brother, has been subpoenaed.  The child, which

6    Mr. Haller got to interview him in the bailiff's

7    office this morning, Carlos says --

8              MR. HALLER:  Well, I was there when you

9    interviewed them.

10             MRS. WITHERS:  I've talked to Lisa and

11   I've talked to the uncle, Roberto, and this is what

12   I told them and why.

13             THE COURT:  Lisa and Pam have been

14   subpoenaed.  So presumably they will be here?

15             MR. HALLER:  These are exonerating

16   statements of half the witnesses that I didn't know

17   about, and I'm halfway through the trial.  I had a

18   right to that under Brady.

19             THE COURT:  Well, I mean you certainly

20   knew that Carlos would say those things.

21             MR. HALLER:  No.  No.  I mean you've got

22   this unsigned letter, and I don't think that letter

23   starts out, you know, "I am Carlos".

1          MRS. WITHERS:  It does.

2          MR. HALLER:  I think one is attached to --

3          MRS. WITHERS:  No, we need to make a copy

4    of that letter and make it a part of the record.

5    It begins, I, Carlos, Jr. say this, and I, Carlos,

6    Jr. say that.  He refers to himself two or three

7    times in that letter.  That's the only reason I

8    think that -- and the fact that he did write it.

9    This morning when I talked to him about it, he said

10   he did write that.  "My dad told me what to say and

11   I wrote it."  It's not signed, it's not dated.  On

12   the top of the letter it's --

13         THE COURT:  It's in affidavit form?

14         MRS. WITHERS:  In affidavit form.  And

15   somebody -- it has noted on the top of the letter

16   that it was hand-delivered to the Public Defender's

17   Office on September 13th by Roberto, the

18   defendant's brother.  So obviously it was a letter

19   written sometime between August 9th and September

20   13th.  It was a fairly recent letter immediately

21   following the arrest.  So it does appear to be a

22   letter that Carlos, Jr. wrote.

23         THE COURT:  All right.

1       MRS. WITHERS:  But it might be helpful to

2   make that part of the record.

3       THE COURT:  When we go back, we will do

4   that.  You know, I think you were certainly aware

5   of this to some extent, Mr. Haller.  You certainly

6   were not, I guess, of what these children would say

7   to the DFS worker, but you were aware and we are in

8   the middle of things.  Do you want the afternoon to

9   look at these records more and prepare better for

10  the examination of the children, and, if necessary,

11  the evidence worker?  If you think you need that

12  time, I would like to give you that time.  I don't

13  think this is a total shock and surprise to you.

14      MR. HALLER:  Oh, the Child Protective was.

15  That was a total shock.  It's down there, black and

16  white, typed by a State official.

17      THE COURT:  I understand that.  But the

18  fact that at least one of the children will say

19  something different than the State's theory of the

20  case -- you know, you had a letter before.

21      MR. HALLER:  The Public Defender's Office

22  gets a lot of letters made up by people, and they

23  are not always the people who purportedly make the